IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MAYRY FREESE, | ) | CASE NO. 3:11CV99 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Mayry Freese ("Freese") seeks judicial review of the final decision of Defendant
Commissioner of Social Security ("Commissioner") denying her application for Disability
Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§
416(i) and 423.  Doc. 1.  This case is before the Magistrate Judge pursuant to the consent of the
parties.  For the following reasons, the final decision of the Commissioner is AFFIRMED.

**I.  Procedural History**

On July 27, 2006, Freese filed an application for DIB benefits, alleging a disability onset
date of June 5, 2006.  Tr. 94-99, 115.  Freese claimed that she was disabled due to fibromyalgia,
depression, pain and fatigue, concentration limitations, and a thyroid condition.  Tr. 54, 94-99,
119.  Freese's date last insured under the Social Security Act was March 31, 2008.[1]  Tr. 8, 10.
The state agency denied Freese's claim initially on February 14, 2007 (Tr. 50-52), and on
reconsideration on April 18, 2007.  Tr. 54-56.  On June 18, 2007, Freese filed a written request
for a hearing (Tr. 60) and, on June 4, 2009, a hearing was held before Administrative Law Judge
Sean Teehan (the "ALJ").  Tr. 51-90.  In a decision dated September 2, 2009, the ALJ
determined that Freese was not disabled or entitled to benefits.  Tr. 8-16.  On September 18,

---

[1] To be entitled to disability insurance benefits, Freese must establish that she was disabled prior to her date last
insured.  20 C.F.R. § 404.315(a)(1); *see also Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997).

2009, Freese requested review of the ALJ's decision by the Appeals Council.  Tr. 93.  On

November 22, 2010, the Appeals Council denied review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-4.

## II.  Evidence

### A.    Personal Evidence

Freese was born on September 20, 1962 and was 44 years old as of the alleged disability

onset date.  Tr. 94.  Freese completed high school and some college courses.  Tr. 23, 125.  At the

time of the administrative hearing, she rented an apartment and lived with her 14-year-old

daughter.  Tr. 28-29.

### B.    Medical Evidence

#### 1.    Treatment History

In October 1993, Freese was diagnosed with fibromyalgia by Robert McNutt, M.D.  Tr.

389.  Dr. McNutt reported that Ms. Freese exhibited chronic pain in the lower part of the cervical

spine, as well as the upper and lower lumbar region.  Tr. 389.  Dr. McNutt reported that this pain

was not preceded by an injury and was able to rule out other causes for chronic, diffuse muscular

pain.  Tr. 389.  Based on his physical examination, Dr. McNutt issued a rule-out diagnosis of

fibromyalgia.  Tr. 389.

Freese received sporadic treatment for hypothyroidism, headaches, pain, and other

ailments between 1993 and June 5, 2006, her alleged disability onset date.  Tr. 160, 162, 164–66,

185–96, 229–56, 279–89, 291–94.  For example, Freese's family doctor, Michael Sauber, M.D.,

noted in August 2005 that Freese had "multiple aches in [her] back consistent with clinical

fibromyalgia."  Tr. 255.  On November 11, 2005, Freese reported to Dr. Sauber that medication

was helpful with sleep, aches, and pain, and that her fibromyalgia was improving.  Tr. 250.  On

2

February 28, 2006, Freese informed Dr. Sauber that she felt better in the morning while on medication.  Tr. 241.  On April 8, 2006, Dr. Sauber recommended that Freese attend physical therapy.  Tr. 235.  In addition, on April 24, 2006, Freese noted that she was experiencing "much less pain" after a medication adjustment.  Tr. 232.  And, on May 8, 2006, Dr. Sauber reported that Freese was "moving in the right direction with the pain level."  Tr. 229.

On June 5, 2006, the alleged onset date, Freese saw Dr. Sauber.  Tr. 277.  Dr. Sauber diagnosed Freese with fibromyalgia, stating that "[s]he has trigger points consistent with fibromyalgia."  Tr. 227.  He also noted that Freese had "not been able to get to physical therapy as she would like."  Tr. 227.  Dr. Sauber reported that Freese was "quite distraught" by her discomfort and stated that he would "take her off work for two weeks" and referred her to Dr. Syed.  Tr. 227.  He also offered Freese a psychotherapy evaluation, which she refused.  Tr. 227.

On June 15, 2006, Freese presented to Dr. Sauber for a follow-up appointment.  Tr. 226. Dr. Sauber noted that, on June 5, 2006, he gave Freese a slip to be off work until June 15, and that he had hoped Freese could make an appointment with Dr. Syed by June 15 but that she had not been able to schedule an appointment until June 20.  Tr. 226.  As a result, Dr. Sauber wrote another slip excusing Freese from work until June 20, 2006.  Tr. 226.  Dr. Sauber also noted that Freese stated she was unable to work because of the amount of pain she was having due to her fibromyalgia.  Tr. 226.

On June 22, 2006, Freese saw Dr. Sauber and reported that she was still was unable to work because of her pain. Tr. 224.  Because of the questions regarding Freese's ability to work, Dr. Sauber scheduled Freese for a functional capacity evaluation and recommended that she not work until the evaluation was completed.  Tr. 224.

On July 10, 2006, occupational therapist Cynthia Wise, OT/L, completed a functional capacity evaluation of Freese, on referral from Dr. Sauber.  Tr. 171-79.  During the examination, Freese acknowledged that she was primarily responsibility for household chores including "vacuuming, laundry, cooking, grocery shopping and mowing the yard with a push mower."  Tr. 171.  Examination results were mostly normal.  Tr. 172, 176–78.  Wise opined that Freese had a reduced capacity for static sitting, standing, or walking, as well as performing repetitive deep squats, and needed to alternate postures and change position as needed.  Tr. 172, 178.  She concluded that Freese demonstrated the "functional capacity to perform secretarial functions as long as no task is done on a constant or repetitive basis sustained over a one to two hour period of time" and that she does require frequent position change with no prolonged standing.  Tr. 174.  Wise opined that Freese had the ability to perform a range of sedentary to light work.  Tr. 179.

Freese attended physical therapy in June and July 2006.  Tr. 272-273.  On June 27, 2006, she complained of high tension and stress, as well as pain bilaterally in her hips and low back.  Tr. 273.  Freese reported that physical therapy had made her feel better, but not good.  Tr. 273.  On July 6, 2006, Freese complained of chronic bilateral hip and cervical pain and told her physical therapist that she planned to start aquatic therapy for additional pain relief.  Tr. 272.  At a physical therapy session on July 16, 2006, Freese reported "0/10" pain levels, i.e., her pain was at 0 on a scale of 1 to 10.  Tr. 268.

On July 21, 2006, Freese saw Dr. Sauber and stated that her pain was still present "but doing as well as we can do" on her medications.  Tr. 222.  On August 28, 2006, Dr. Sauber noted that Freese was skipping physical therapy, despite his "strict[]" encouragement to attend.  Tr. 220.  Dr. Sauber also noted that Freese needed her monthly slip to be excused from work and that the functional capacity had been completed.  Tr. 220.  He reported that the Bureau of

4

Vocational Rehabilitation was working with Freese to help her find a job that fit her skills, and that he would excuse her from work on a month-by-month basis while the Bureau of Vocational Rehabilitation continued to work with her to look for a suitable job.  Tr. 220.

Freese had a lapse in physical therapy in the late summer 2006, but resumed in September 2006.  Tr. 261-262.  At that point, she rated her bilateral hip pain at 3 to 4 out of 10.  Tr. 261.  On October 5, 2006, Freese's physical therapist noted that Freese had 19 "no shows" or cancellations.  Tr. 290.  She recommended discharge due to poor compliance. Tr. 290.

On September 28, 2006, Dr. Sauber noted that Freese was not taking her medications as prescribed.  Tr. 214.  Freese explained to Dr. Sauber that she was not taking all of her medications because she was worried about addiction.  Tr. 214.  Freese also noted that her pain increased when she stopped taking one of her medications.  Tr. 214.  Dr. Sauber explained to Freese that addiction was unlikely.  Tr. 214.

Freese did not return to Dr. Sauber until February 8, 2007.  Tr. 211.  At that time, she noted that her pain varied from 2 to 8 on a scale of 10.  Tr. 211.  Dr. Sauber noted that he may refer Freese to rheumatology for further evaluation.  Tr. 211.

On July 23, 2007, Freese underwent an initial intake assessment with Glenis Sundberg at Park Center for psychological assessment.  Tr. 334-338.  Mr. Sundberg reported that Freese complained of difficulty concentrating and paying attention, as well as suicidal ideations.  Tr. 334.  Mr. Sundberg diagnosed Freese with a mood disorder due to her generalized medical conditions.  Tr. 339.  He assessed her Global Assessment of Functioning ("GAF") score at 46[2]

[2] GAF measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.  *Id.*

and referred Freese to counseling and medication management.  Tr. 336.  Freese did not follow

up with these providers.

On February 20, 2008, Freese saw Melissa Walther, M.D., for medication management.

Tr. 342-343.  Dr. Walther reported that Freese had developed chronic, intermittent left elbow

pain while working on the computer at home.  Tr. 342.  Dr. Walther also reported tenderness

over the lateral epicondyle focally which was worse with resisted extension of the wrist.  Tr. 343.

Freese's date last insured for disability purposes was March 31, 2008.  Tr. 8, 10.

### 2.       State Agency Evaluations

On January 8, 2007, state agency consultative psychologist Michael J. Wuebker, Ph.D.,

interviewed Freese.  Tr. 306-10.  Dr. Wuebker assessed Freese's GAF at 57.[3]  Tr. 309.  Dr.

Wuebker concluded that Freese's mental ability to relate to others, including fellow workers and

supervisors, was unimpaired.  Tr. 309.  Dr. Wuebker opined that Freese's mental ability to

understand, remember, and follow simple instructions in a work environment was mildly

impaired.  Tr. 309. Dr. Wuebker also found that Freese's mental ability to maintain attention,

concentration, persistence, and pace to perform simple repetitive tasks in a work milieu was

moderately impaired.  Tr. 310.  Finally, Dr. Wuebker opined that Freese's mental ability to

withstand the stress and pressures associated with day-to-day work activity was moderately

impaired commensurate to her ability.  Tr. 310.

On February 8, 2007, state agency psychologist Cindy Matyi, Ph.D., reviewed Freese's

medical records and completed a Psychiatric Review Technique.  Tr. 312-326.  Dr. Matyi opined

that Freese had a moderate restriction in activities of daily living, mild difficulties in maintaining

---

[3] A GAF score of 51 to 60 is indicative of an individual who has moderate symptoms or moderate difficulty in
social, occupational, or school functioning. DSM-IV-TR, at 34.

social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. 323.

Dr. Matyi also completed a Mental Residual Functional Capacity Assessment.  Tr. 327-30.  She noted that Freese's treating physician, Dr. Sauber, offered no disability opinions or statements.  Tr. 329.  She also noted that Freese's activities of daily living were fairly functional.  Tr. 329.  Dr. Matyi opined that Freese was capable of comprehending, remembering, and carrying out a variety of simple and complex tasks, that Freese's concentration and persistence were at most moderately reduced due to depressive symptoms and preoccupation with physical complaints, that Freese was able to engage appropriately in simple social interactions necessary in a workplace and has the ability to routinely interact with others, and that Freese had no significant limitations in adapting to routine changes in the typical work setting but could have significant problems adapting to frequently changing job expectations or requirements.  Tr. 329.

## C.    Testimonial Evidence

### 1.    Freese's Testimony

On June 4, 2009, Freese appeared with counsel and testified at the administrative hearing.  Tr. 17-47.  Freese testified that she was diagnosed with fibromyalgia in 1993 and quit her job as a secretary shortly thereafter.  Tr. 23.  Freese testified that she was currently working part-time as an independent contractor for Live Ops, providing call center agent services.  Tr. 24, 27–28.  She explained that she would take orders from customers and that she was paid for the amount of time she spends on the phone.  Tr. 27.  Freese stated that she was allowed to work from home on her own schedule, and that she was able to schedule herself for 25 minute intervals and then take a 35 minute (or longer) break to walk around and stretch.  Tr. 28.

Freese testified that she generally wakes up every morning at 6:30 a.m. and helps her daughter get ready for school.  Tr. 30.  She then tries to work for "an hour or two," but must lie down for several hours, usually until her daughter gets home from school in the afternoon.  Tr. 30.  Freese also testified that she cooks dinner, cleans the house, vacuums, loads and unloads the dishwasher, does laundry, and shops for groceries.  Tr. 30-31.  She also stated that can drive a car, but that she did not own a car.  Tr. 31.

Freese testified that she experiences severe chronic pain which starts at the back of her head and radiates down her spine and across her hips and all along her whole back.  Tr. 33.  She explained that she also has chronic knots under her shoulder blades.  Tr. 33.  Freese testified that she experiences pain and stiffness every morning, and that on bad days she is confined to bed all day.  Tr. 33.

### 2.       Vocational Expert's Testimony

Ruth Baruch, a vocational expert ("VE"), also testified at the hearing.  Tr. 38-46.  She testified that Freese had worked as an administrative assistant (sedentary exertional level and skilled), a medical records clerk (sedentary exertional level and semi-skilled), a vocational training teacher (light exertional level and skilled), a cashier (light exertional level and semi-skilled), a shipping clerk (medium exertional level and semi-skilled), and a telephone order clerk (sedentary exertional level and semi-skilled).  Tr. 39.

In a hypothetical, the ALJ asked the VE whether a person could perform any of Freese's past relevant work or any other work available in the national economy if the individual had the same vocational factors as Freese and the following limitations: could perform sedentary work, would need the ability to work at a reasonable pace in work settings that do not require strict production goals, would be capable or comprehending, remembering, and carrying out a variety

of simple and some complex tasks, would have the ability to routinely interact with others in the course of performing daily activities, and would be able to deal with routine changes in a typical work setting, but would have significant problems in adapting to frequently-changing job expectations and requirements.  Tr. 40.  The VE testified that she could perform her work as a telephone order clerk.  Tr. 40.  The VE also testified that such a person could perform sedentary jobs such as information clerk (1,256,400 jobs nationally; 34,810 jobs statewide) and surveillance systems operator (126,830 jobs nationally; 2,840 jobs statewide).  Tr. 41-42.

The then ALJ asked the VE to add the following limitations to the hypothetical: the individual would need to change positions at least every hour, have the ability to stretch as needed, and static standing, sitting, and squatting would be discomforting on a repetitive basis.  Tr. 42-43.  The VE testified that the person would still be able to perform the jobs of information clerk, surveillance systems operator, and 50 percent of the available jobs of telephone order clerk.  Tr. 43-45.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ

9

is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his September 2009 decision, the ALJ found that Freese had not engaged in substantial gainful activity during the period from her alleged onset date of June 5, 2006 through her date last insured of March 31, 2008.  Tr. 10.  The ALJ determined that Freese had the following severe impairments: depression, history of law back pain, and fibromyalgia.  Tr. 11.  The ALJ

found that Freese did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P , App. 1.  Tr. 11. The ALJ next determined that Freese retained the RFC to perform a range of light work subject to the following limitations: that she must not have to lift/carry more than 10 pounds; that she must not have to perform repetitive deep squats and that she must be able to shift positions every hour so as to avoid static standing; and that she has moderate limitations on her ability to understand, remember and carry out detailed instructions, to maintain attention for extended periods and to complete a normal work tour without interruptions.  Tr. 13.  Finally, considering her vocational factions, RFC, and the testimony of the VE, the ALJ found that, through the date last insured, Freese was capable of performing some of her past work, as well as making an adjustment to perform other jobs that existed in significant numbers in the national economy.  Tr. 14.  Thus, the ALJ concluded that Freese was not disabled.  Tr. 15.

## V.  Arguments of the Parties

Freese asserts two interrelated challenges to the Commissioner's decision with regard to her fibromyalgia -- that the ALJ did not properly consider and evaluate her fibromyalgia or her complaints of disabling pain in his RFC analysis.  In conjunction with these arguments, Freese claims that the ALJ did not adequately consider the opinions of her treating physicians.  In response, the Commissioner asserts that the ALJ properly considered and assessed Freese's fibromyalgia and her complaints of debilitating pain in his RFC finding.  The Commissioner also contends that the ALJ complied with the treating physician rule in reaching his RFC determination.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.    The ALJ Did Not Err in Evaluating Freese's Fibromyalgia or her Claims of Debilitating Pain in his RFC Determination

Freese argues that, even through the ALJ found her fibromyalgia to be a severe impairment, he did not properly consider the limitations caused by her fibromyalgia or her complaints of debilitating pain in his RFC analysis. Doc. 12, pp.13-18.  Because these arguments are closely related, the Court will address them together.  Both arguments are without merit.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 244, n.3 (6th Cir. 2007) (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at

12

541 (5th ed. 2005)).  The Sixth Circuit has recognized that fibromyalgia can result in a disability.

*See, e.g., Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988).

Nevertheless, fibromyalgia presents challenges in disability analyses because, "unlike medical

conditions that can be confirmed by objective testing, fibromyalgia patients present no

objectively alarming signs." *Rogers*, 486 F.3d at 243; *see also Swain v. Comm'r of Soc. Sec.*,

297 F.Supp.2d 986, 990 (N.D. Ohio 2003) ("Fibromyalgia is an 'elusive' and 'mysterious'

disease. It has no known cause and no known cure.").  In other words, objective medical

evidence corroborating allegations of pain derived from fibromyalgia is often nonexistent.  *See

id.*  In this regard, the Sixth Circuit has recognized that, for claims based upon fibromyalgia, the

cause of the disability is not the underlying condition itself but, rather, the symptoms associated

with the condition -- including complaints of pain, stiffness, fatigue, and inability to concentrate.

*Rogers*, 486 F.3d at 247.  Despite the unique nature of the impairment, however, a mere

"diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits."

*Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008), *citing and quoting

Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have a severe case of

fibromyalgia as to be totally disabled from working . . . but most do not and the question is

whether [the claimant] is one of the minority.'")).

　　　　Because neither the presence nor the severity of fibromyalgia can be confirmed by

objective testing, there is a greater emphasis on the claimant's credibility.  *Swain*, 297 F.Supp.2d

at 990.  Where the symptoms and not the underlying condition form the basis of the disability

claim, a two-part analysis is used in evaluating complaints of disabling pain.  *Id.* (citing 20

C.F.R. § 416.929(a)).  First, the ALJ will ask whether the there is an underlying medically

determinable physical impairment that could reasonably be expected to produce the claimant's

13

symptoms.  20 C.F.R. § 416.929(a).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*  Relevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions.  *Id.*; s*ee also* Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *2–3.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247.  An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Id.*  In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  The court may not "try the case de novo, nor resolve conflicts in evidence."  *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

In this case, the ALJ accepted that Freese suffered from fibromyalgia and found it to be a severe impairment.  Tr. 10.  The ALJ then determined that Freese could perform a limited range

14

of light work and was therefore not disabled.  Tr. 13-14.  In reaching this conclusion, the ALJ

considered Freese's treatment for fibromyalgia, back pain, and depression as well as her

testimony at the hearing.  Tr. 11, 13–14.  The ALJ found it persuasive that Freese's examination

results were often mild and that occupational therapist Wise found that Freese was capable of

performing various work-related functions.  Tr. 11, 13–14.  Additionally, the ALJ noted that

Freese was admittedly capable of performing a wide range of activities of daily living, including

working part-time from home.  Tr. 12, 13–14.

      The issue in dispute is the ALJ's RFC determination.  Freese argues that the ALJ erred

because he did not consider the effects of her fibromyalgia in formulating the RFC.  Specifically,

Freese contends that the ALJ failed to consider the opinions of her treating physicians in his RFC

analysis, in violation of the treating physician rule.[4]  The only opinion to which Freese directs

the Court is that of Dr. Sauber.  Doc 12, p. 15.  However, Dr. Sauber did not offer any opinion as

to Freese's functional abilities or whether fibromyalgia caused any limitations on her ability to

work for anything other than a very short period.  On June 5, 2006, Dr. Sauber stated that Freese

was unable to work for a period of only two weeks.  Tr. 227.  On June 15, 2006, Dr. Sauber

confirmed that Freese was unable to work only through June 20th.  Tr. 226.  Then, on June 22,

2006, Dr. Sauber noted that Freese should not work until a functional capacity evaluation was

completed by an occupational therapist.  Tr. 224.  That evaluation, performed by occupational

therapist Wise in July 2006, showed that Freese was capable of performing a range of "sedentary

to light" work.  Tr. 179.  Thus, Dr. Sauber did not provide any long-term, functional opinion for

---

[4] Under the treating physician rule, an ALJ must give the opinion of a treating source controlling weight if he finds
the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not
inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,
544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides to give a treating source's
opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make
clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that
weight.  *Wilson*, 378 F.3d at 544.

the ALJ to consider.  Sixth Circuit case law makes clear that the Commissioner is under no duty to give special weight to a physician's observations when there is no medical opinion to be weighed.  *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) (ALJ under no duty to grant medical opinion great weight when there is no opinion given regarding functional abilities).

Moreover, to the extent that Dr. Sauber's notes can be construed as an opinion that Freese was "disabled" or "unable to work," such an opinion is not entitled to significant weight because finding a claimant "unable to work" addresses an issue reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(1); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.").  Dr. Sauber offered no opinion as to Freese's work-related abilities other than generally concluding that she was temporarily unable to work and, as a result, his notes were not entitled to any deference.

In the absence of any opinion on Freese's functional imitations from a treating physician, the ALJ relied upon the functional capacity evaluation performed by occupational therapist Wise, which was ordered by Dr. Sauber.  Tr. 11.  Wise determined that Freese could perform a range of "sedentary to light" work, but had a reduced capacity for static sitting, standing, or walking and deep squatting on a repetitive basis.  Tr. 172, 178, 179.  She also noted that Freese's "[p]ain complaint are intermittent with relief as soon as the body position is changed."  Tr. 172. The ALJ's RFC finding is consistent with Wise's functional capacity assessment, as the ALJ found that Freese was capable of performing light work except she should be able to shift positions to avoid static standing and must not have to perform repetitive deep squats.  Tr. 13. Thus, the ALJ did not offend the treating physician rule in reaching his RFC determination.

Freese also argues that the ALJ erred in finding that her complaints of debilitating pain and symptoms were less than fully credible.  Doc. 12, pp. 16–17.  This argument is without merit because the ALJ provided several reasons for discounting Freese's credibility and finding that she is not "one of the minority" whose fibromyalgia symptoms are so severe as to be disabling. See *Vance*, 260 Fed. App'x at 806, *quoting Sarchet*, 78 F.3d at 307.   In his RFC analysis, the ALJ cited the appropriate regulation – 20 C.F.R. § 404.1529 – and Social Security Rulings – SSRs 96-4p and 96-7p – and outlined the two-step analysis for evaluating credibility and pain. Tr. 13-14.  The ALJ then summarized Freese's testimony and discussed Freese's activities of daily living.  Indeed, the ALJ noted that Freese was able to attend to self-care, travel independently, perform household chores, take care of her child, and manage basic finances, as well as cook limited meals and load and unload the dishwasher.  Tr. 12, 13–14.  Freese also acknowledged driving a car, shopping for groceries, taking care of her dog, mowing the lawn, and using the computer.  Tr. 30–31, 128, 130, 171.  Freese's wide array of activities undermined her complaints of debilitating pain.  *See Blacha v. Sec'y of H.H.S.*, 927 F.2d 228, 231 (6th Cir. 1990) ("As a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain.").

The ALJ likewise considered Freese's ability to work part-time from home as a part of her daily activities and emphasized that this was not consistent with her claims of debilitating pain.  Tr. 13; *see SSR 96-7p, 1996 WL 374186*,\*5 ("One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.").  Freese's activities of daily living, including her part-time work from home, support the ALJ's determination that Freese's subjective complaints were not fully credible.  *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("The ALJ could properly determine

17

that [claimant's] subjective complaints were not credible in light of her ability to perform other tasks."); *see also Shaw v. Sec'y of H.H.S.*, No. 91-2365, 1992 WL 317152 (6th Cir. Oct. 29, 1992) ("[Claimant's] return to work following surgery can properly be taken into account in determining whether she [was] disabled . . . .").

    Additionally, the ALJ noted that the medical evidence did not show any motor, reflex or sensation deficits, and that Freese had good grip strength and full range of motion in her upper extremities.  Tr. 14.  The ALJ noted that the treating physician reported that she exhibited no subjective symptoms and that her motor/sensory exam was within normal.  Tr. 14.  He also pointed out that Freese took Lyrica for her fibromyalgia.  Tr. 14.  The ALJ found that all of this evidence supported a conclusion that Freese's pain was not a debilitating as she claimed.

    A review of the record reveals that the ALJ's evaluation of Freese's complaints of disabling pain, as well as his RFC finding, are supported by substantial evidence.  For example, although Freese sought treatment for her impairments, including fibromyalgia, she did so only sporadically and inconsistently, suggesting that her symptoms were not as severe as she claimed. She did not see a rheumatologist or other specialist on a regular basis.  Tr. 35.  Furthermore, numerous treating medical sources noted that Freese had significant issues of noncompliance with respect to attending physical therapy sessions or other medical appointments and taking her medications.  Tr. 214, 220, 227, 258, 259, 260, 264, 268, 269, 272, 274, 275, 279, 280, 282, 283, 284, 290, 331, 430, 431, 433.  The record also documents that Freese's condition improved when she followed her treating sources' recommendations and prescriptions:

    -    Freese stated that her pain increased when she stopped taking medication (Tr. 214);

    -    Dr. Sauber noted that Freese was "moving in the right direction with the pain level" (Tr. 229);

    -    Freese noted "much less pain" after a medication adjustment (Tr. 232);

- Freese felt better in the morning when taking medication (Tr. 241);

- Freese noted that medication helped with pain and sleeping and that her fibromyalgia was improving (Tr. 250);

- Freese reported that physical therapy made her feel better, but not good (Tr. 273);

- Freese reported that her pain was 0 out of 10 when attending physical therapy in July 2006 (Tr. 268);

- When Freese resumed physical therapy in September 2006, she rated her pain at 3 to 4 out of 10 (Tr. 261).

The record as a whole supports the ALJ's finding that Freese was less-than fully credible and that she was capable of performing a limited range of light work.

Freese's main complaint appears to be that the ALJ did not precisely follow the credibility analysis and address each specific factor of the analysis. This argument places form over substance. Even though the ALJ did not individually address each factor, his written decision demonstrates that he did consider those factors and the relevant evidence. Tr. 13-14; *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732-33 (N.D. Ohio 2005). While the ALJ could have been more precise in connecting his discussion of the evidence to his ultimate credibility conclusions, the decision was sufficiently clear to allow a reviewing court to determine the weight the ALJ gave to Freese's complaints of pain.

In sum, the ALJ provided several reasons for discounting Freese's credibility and his decision indicates that he considered the relevant factors under 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p. Substantial evidence -- including Freese's wide array of activities of daily living -- supporting the ALJ's RFC finding and his ultimate conclusion that Freese's fibromyalgia is not so severe as to be totally disabling. The decision of the ALJ is therefore affirmed.

**B.      Inaudible Portions of the Hearing Transcript Do Not Warrant Remand**

In her brief on the merits, Freese notes that "more than 25 seconds of vocational expert testimony" is marked "inaudible" in the record.  Doc. 12, p. 12.  She also states that "these gaps are not crucial to this case," but explains that this is because the ALJ erred in several ways in steps of his analysis that preceded his consideration of the VE's testimony.  Freese has failed to develop any argument regarding the gaps in the testimony and she does not ask for a remand based on the gaps.  It is not the Court's function to search the administrative record for evidence to support a claimant's argument. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").  Thus, any issue regarding the inaudible gaps is deemed waived.

Remand would not be warranted in any event.  The transcript appears inaudible during several portions of the ALJ's hypothetical questions and the vocational expert's responses.  Tr. 40–43.  However, Freese's counsel intervened and asked the ALJ to clarify his hypothetical.  Tr. 43.  Thereafter, the ALJ and the VE essentially repeated their relevant testimony.  Tr. 43–44.  The ALJ explained that his hypothetical included the limitations contained in Exhibits 12F and 2F page 12.  Tr. 43.  The VE opined that a person with such limitations could perform jobs such as surveillance operator and information clerk, as well as 50 percent of telephone clerk positions.  Tr. 44–45.  The transcript contains the VE's earlier testimony regarding the numbers of jobs for each position and the job number as described in the DICTIONARY OF OCCUPATIONAL TITLES.  Tr. 41–42.  Upon review of the entire testimony of the VE, as well as the record as a whole, the inaudible gaps are not crucial to deciding this case and do not warrant remand.

20

**C.      Evidence Submitted to the Appeals Council by Freese After the ALJ's Decision**

Freese's counsel submitted additional medical records to the Appeals Counsel in February and May 2010, well after the ALJ rendered his decision in September 2009.  Tr. 398–448.  Freese discusses these records at length in the "Statement of Facts" in her brief on the merits.  Doc. 12, pp. 9–11.  However, evidence submitted after the ALJ's decision may only be considered for purposes of a "sentence six" remand.  *See, e.g., Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).  Sentence six of 42 U.S.C. § 405(g) provides that remand for consideration of new evidence is appropriate only where the party seeking remand shows that the evidence is new and material.  *See, e.g., Sizemore v. Sec'y of H.H.S.*, 865 F.2d 709, 711 (6th Cir. 1988).  Freese has made no such showing and no request for a sentence six remand.  Accordingly, these medical records do not support a remand.[5]  *McPherson*, 125 F.3d at 995-96.

### VII.  Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Maryry Freese's application for DIB is AFFIRMED.

Dated: February 27, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

---

[5] In a footnote, Freese cites one of the late submitted medical records in stating, "While this brief addresses other issues, Ms. Freese may have met Listing 1.04 as of October 14, 2009, when she underwent an MRI which showed Grade I spondylolisthesis and moderate left neural foraminal narrowing."  Doc. 12, p. 14.  Freese makes no attempt to develop this argument and it is therefore deemed waived.  *McPherson*, 125 F.3d at 995-96.